IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


UNITED STATES OF AMERICA,      CRIMINAL ACTION

          vs.                  No. 03-35E

JENNIFER HOLLAND,

     Defendant.


═══════════════════════════════════


Transcript of SENTENCING HEARING
commencing on JUNE 8, 2005
United States District Court, Erie, Pennsylvania
BEFORE:  HONORABLE MAURICE B. COHILL, JR., DISTRICT JUDGE


<u>APPEARANCES</u>:

For USA:                        Christine A. Sanner, Esq.
                                Assistant U.S. Attorney
                                U.S. Attorney's Office
                                Federal Courthouse
                                South Park Row
                                Erie, PA  16501

For the Defendant:              Thomas Patton, Esq.
                                Federal Public Defender
                                1001 State Street
                                Erie, PA  16501




Court Reporter:                 Karen M. Earley, RDR-CRR
                                619 U.S. Courthouse
                                Pittsburgh, PA  15219
                                412-201-2660


Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENSE WITNESSES: |  |  |  |  |
| Jack Horner | 8 | 16 | 22 | -- |
| Robert Pettis | 24 | 41 | 55 | -- |
| | | | | |
| GOVERNMENT WITNESS: |  |  |  |  |
| Laura Guncheon | 60 | 64 | 65 | |

1                       P R O C E E D I N G S

2    (In chambers.)

3                    THE COURT:  Richard, my law clerk, said that

4    Mr. Patton had indicated a desire to have some testimony from

5    witnesses here with respect to sentencing and taken under seal

6    in chambers, and Ms. Sanner objected.  So Richard, the law

7    clerk, had a good idea.

8                    Let's hear the argument here and see where we go

9    from there.

10                    MR. PATTON:  Your Honor, we're going to plan on

11    calling two witnesses.  Jack Horner, who is in CASA --

12                    THE COURT:  Is he from Pittsburgh?

13                    MR. PATTON:  No.  From up here.

14                    THE COURT:  Not related to Judge Rangos?  She's got

15    a brother named Jack Horner.

16                    MR. PATTON:  He never mentioned anything along

17    those lines.

18                    THE COURT:  I know him so I'll know him when I see

19    him.

20                    MR. PATTON:  And also Bob Pettis, who's working

21    with NCI as a case worker on its Highland case.

22                    Those two gentlemen are going to be testifying in

23    some detail about the treatment that Holland's son Zachary and

24    Sean had received while they were in OCY.

25                    John Horner, through CASA, was a special advocate

1    appointed for the kids while they were in OCY custody and will

2    talk about the different placements they were in, the progress

3    they made, the problems that they had, and things of that

4    nature.

5         I would request that they be allowed to provide

6    that testimony in chambers because it is highly sensitive

7    information about Zachary and Sean in that it's information

8    that normally wouldn't be made available to the public, and I

9    don't think in this instance it needs to be made available to

10   the public.

11        They would be testifying -- Ms. Holland would be in

12   here.  They would be testifying in front of you.  Ms. Sanner

13   will be here.  She will be allowed to cross-examine them so

14   the Government isn't going to lose any ability to present its

15   case and question them.

16        I think out of concerns for the sons, it would be

17   the appropriate way to handle it.

18             THE COURT:  Are the sons here?

19             MR. PATTON:  They're not.  They're both in school.

20             THE COURT:  Ms. Sanner.

21             MS. SANNER:  The Government would respond this is

22   and should be a public proceeding.  It is a very serious

23   offense.  It affects more than just the defendant.  It affects

24   the community and does affect her family.

25             I wonder if this Court holds it in chambers who we

1  are actually protecting.  I don't think we would be protecting

2  the children.

3          The older child has reached the age of majority.

4  The defense has filed a downward departure motion.  It is a

5  public filing.  I don't think it's necessary in any way to go

6  into the children's names.  The children can be protected in

7  that way.

8          The only child that is relevant or at issue in this

9  case would be the younger child because the older child has

10  reached the age of majority, so he can't even be considered

11  for a downward departure for extraordinary family

12  circumstances, and I don't think there's anything additional

13  outside what has been in the PSR that will in any way harm the

14  child further, and I think it actually protects the defendant,

15  which the Government takes great issue with.

16          THE COURT:  I am going to come down on the side of

17  the Government.  It is a public hearing.  These people, I

18  assume, are going to be testifying in her behalf anyway, so

19  I'll think we'll do it in the courtroom.  Okay.  I'll be out

20  in a minute.

21          (In-chambers discussion was concluded.)

22                  (In open court.)

23          THE COURT:  Good afternoon.  This is the time set

24  for the sentencing of Jennifer Holland.  We note Ms. Holland

25  and her attorney Mr. Patton have signed the notice indicating

1    they have received and reviewed the presentence report.  We'll

2    make that presentence report part of the record under seal so

3    if an appeal should be taken, of course, counsel on appeal

4    will be permitted access to the report.

5            There's been no information withheld from the

6    defendant which has been given to the Court.

7            In the wake of the recent decision by the United

8    States Supreme Court in United States against Booker, 125

9    Supreme Court, 738 year 2005, the sentencing guidelines are

10   now advisory only.  However, the Court is still obligated to

11   consult the guidelines in determining imposition of a

12   reasonable sentence.

13           Therefore, to the extent it is necessary, the Court

14   will address objections to the presentence report and resolve

15   any factual disputes regarding the guidelines on the record as

16   we did before.  This is because the Court cannot reasonably

17   consider the guideline range, as we must under Booker, until

18   we've properly determined what that range is.

19           In addition, under Booker, after calculating the

20   applicable range prescribed by the guidelines, the Court must

21   consider the factors set forth in 18 United States Code,

22   Section 3553(a).

23           I'm not going to read 18 United States Code,

24   Section 3553(a).  It's quite lengthy, but I will say for the

25   record, the Court has considered all of those factors.

1          The Government doesn't have any objection to the

2    presentence report.  The defendant has filed a position with

3    respect to sentencing factors and does intend to call

4    witnesses, as I understand it.

5          I'm correct, Mr. Patton, you don't have any legal

6    objections to the presentence report, is that correct?

7          MR. PATTON:  That's correct.  We don't have any

8    factual or legal objections to the guideline range that is

9    calculated.

10         It is our position this is a basis for a downward

11   departure, and further our position, if you determine there

12   are not grounds for a classic downward departure from the

13   guidelines, that there are reasons that you should exercise

14   the discretion you now have under Booker to impose a sentence

15   of probation with home confinement.

16         THE COURT:  Well, initially then we found the

17   offense level here is 18, and the criminal history category is

18   Roman Numeral I, therefore, the applicable guideline range is

19   27 to 33 months imprisonment, supervised release of two to

20   three years, a fine in the range of $6,000 to $60,000, and a

21   special assessment of $100.

22         Mr. Patton, you may proceed.

23         MR. PATTON:  Your Honor, I would call Mr. Jack

24   Horner.  Your Honor, I would also make a motion to sequester

25   the witnesses on either side.

John Horner - Direct by Mr. Patton

1      THE COURT:  We'll grant that motion.  I'll ask

2   anybody else that is going to be called to wait out in the

3   hallway.

4                **JOHN HORNER, DEFENSE WITNESS, WAS SWORN.**

5      THE COURT:  Have a seat up here.  Please state your

6   name and spell your last name.

7      THE WITNESS:  My name is John Horner, H O R N E R.

8                        DIRECT EXAMINATION

9   BY MR. PATTON:

10  Q.  Mr. Horner, what do you do for a living?

11  A.  I'm retired.

12  Q.  Where did you work before you retired?

13  A.  I was an eastern regional sales manager for a publication

14  company in Indianapolis.

15  Q.  Generally, what did you do for that job?

16  A.  Basically my responsibility was to hire and train

17  representatives to cover the territories in the eight

18  different states that I had.

19  Q.  What were you selling?

20  A.  Selling educational textbooks, foreign language, English,

21  special education books, as well as instructional materials

22  for science and so forth.

23  Q.  In your retirement, do you do any volunteer work?

24  A.  Yes, I do.

25  Q.  Where do you do that work?

John Horner - Direct by Mr. Patton

1   A.   I do CASA, and I do Meals on Wheels.

2   Q.   What do you do for Meals on Wheels?

3   A.   Well, I deliver one day a week.

4   Q.   Could you explain to the judge what CASA is?

5        THE COURT:   I used to be on the board with CASA in

6   Pittsburgh.  You don't need to go into any extensive --

7   Q.   Through your volunteer work with CASA, did you come into

8   contact with the Holland family?

9   A.   Yes, I did.

10  Q.   And were you appointed to be the special advocate for the

11  Holland's two boys?

12  A.   Yes, I was.

13  Q.   As the boys' advocate, what were your responsibilities?

14  What did you do?

15  A.   Basically we were to see -- CASA is to see that the child

16  is safe basically, No. 1, that they are in a safe environment

17  and that they're getting all of the things that they're

18  supposed to be getting such as education, health care,

19  doctor's appointments, anything that we can do to help assist

20  the child.

21  Q.   Did you do that with the two Holland children?

22  A.   Yes.

23  Q.   Do you know approximately how old the two boys are?

24  A.   Yes.

25  Q.   About how old is the oldest boy?

John Horner - Direct by Mr. Patton

1   A.   18.

2   Q.   And the youngest?

3   A.   6.

4   Q.   Through your work as those two children's special

5   advocate, did you have interaction with the children?

6   A.   Yes, I did.

7   Q.   And at that time where were the children physically

8   staying?

9   A.   Well, initially they were -- the oldest boy was staying at

10  a foster home in Fairview, Pennsylvania, and the younger boy

11  was -- he had been in two different foster homes, and his last

12  one was in Titusville, Pennsylvania.

13  Q.   And did you also have contact with Jennifer and Darren

14  Holland?

15  A.   Yes, I did.

16  Q.   And through your work with the two boys, did you form an

17  opinion as to their relationship, that is, the two boys'

18  relationship with their parents?

19  A.   Yes, I did.

20  Q.   What is your opinion?

21  A.   Well, I felt they were extremely close.  The family was

22  working extra hard and very diligently to get this family

23  reunited after so many years of frustration.

24  Q.   You say they were working extra hard.  Compared to other

25  children -- you have been appointed to act as their special

John Horner - Direct by Mr. Patton

1   advocate.  How would you compare the efforts made by the

2   Holland family compared to the efforts of some other families

3   you had?

4   A.  I thought they did everything absolutely they possibly

5   could, not only to be with these kids but to help them in any

6   way they could.  They attended ball games.  The older boy was

7   playing football.  They attended ball games.  They would pick

8   the boy up from school.  They would take him to school, take

9   him to football practice.

10          I think they went out of their way many, many

11   times, and I know with holidays, they were -- they took kids

12   shopping at different times, Easter and Christmas and so

13   forth.

14          So I felt very strongly they were working very hard

15   to keep the family, get the family together.

16   Q.  It is accurate to say you wrote a letter to Judge Cohill

17   regarding this case?

18   A.  Yes, I did.

19   Q.  And in that letter I believe you said in your opinion,

20   taking Jennifer out of the home would have a devastating

21   effect on the children, is that accurate?

22   A.  Yes, it is.

23   Q.  Is that the way you feel?

24   A.  I do.

25   Q.  Why?

John Horner - Direct by Mr. Patton

1    A.  Well, for a number of reasons.  No. 1, the oldest boy in

2    particular, numerous times Jennifer doesn't even know this, at

3    numerous times he would say to me in anger -- he is a quiet

4    boy.  He doesn't say an awful lot.  He doesn't verbalize too

5    often, but he was very upset any time I would come down to see

6    him.

7             I visited him at school, and I visited him at his

8    home, foster home and so forth, and he would say that, you

9    know, I think it's grossly unfair that I am being punished for

10   something my mother did years ago.

11            He said it just makes me so upset.  In fact, at a

12   couple of the court hearings we had to kind of keep him under

13   control.  He was going to speak out on his own to the judge in

14   that situation, which we wouldn't allow.

15            But it was obvious to me he wanted to be with his

16   parents.  He wanted to be back together.  He wanted to have a

17   family, and that was his main concern.  He wanted his brother

18   back.  He wanted his mother and father back.  He wasn't angry

19   with anybody except the system.

20   Q.  Did you have interaction with the younger boy?

21   A.  Yes, I did.

22   Q.  How was that?

23   A.  Well, initially when he was in the first -- at least my

24   first introduction to Zachary was in a foster home in town

25   here, and he was so upset every time I would visit over there

John Horner - Direct by Mr. Patton

1    that at one time, in fact, when I said it's time to go, I had

2    to go, he grabbed me, grabbed my arms and grabbed my legs and

3    just cried.  He just wanted me to stay.  He wanted to be with

4    his mother and father.

5    Q.  Did he stay at that foster home?

6    A.  I can't remember if he stayed there, but a number of times

7    when I would visit with him, he would say words like he wanted

8    to be -- I want my mother, I want my dad.  He was only four I

9    believe at the time.  I don't think he was cognizant of the

10   situation other than he was not with his family.

11            THE COURT:  How long ago was it when you started

12   the relationship with the family?

13            THE WITNESS:  I want to say two years ago I'm

14   guessing, maybe longer.  Might have been two and a half years

15   ago.

16   Q.  Was the youngest boy moved to a different foster home?

17   A.  Yes, he was.  He was moved to a Titusville, Pennsylvania

18   home.

19   Q.  Through your work, through your CASA volunteer work, does

20   it appear to you that these two children have a good

21   relationship with their parents?

22   A.  Absolutely, 100 percent.

23   Q.  Through your contact with the parents, both Jennifer and

24   Darren, does it appear to you that Jennifer and Darren cared

25   about their children?

John Horner - Direct by Mr. Patton

 1   A.   Absolutely.  Absolutely.  Not only that but the

 2   grandparents, too, in Philadelphia.

 3   Q.   Darren's mother and father?

 4   A.   Yes.  I have spoken with them on the phone a couple times,

 5   too.

 6   Q.   I just want to make sure I have one thing clear.  When you

 7   are appointed as a CASA volunteer, are you appointed to be an

 8   advocate for the children or are you appointed to be an

 9   advocate for the parents?

10   A.   We have nothing to do with the parents, only the children.

11   Q.   So your role is to try to help the children?

12   A.   Yes.  Safety issues so to speak.  You want to make sure

13   the child is safe, secure, and getting everything he deserves.

14   Q.   Based on your experience with the work that you have done,

15   and you have testified how the Hollands have been working very

16   hard to get back to be a family unit, based on your

17   experience, what do you think the impact of having a family

18   now taken apart would be?

19   A.   Well, I think especially with this family, I think it

20   would have a devastating effect, particularly on the older

21   boy.  I think psychologically and mentally I think the older

22   boy is suffering more than you know.

23   Q.   Do you believe that even though the older boy is going to

24   be starting college?

25   A.   Yes, I do.  He's a quiet kid.  He doesn't say much.  He

John Horner - Direct by Mr. Patton

1  has a lot of feelings.

2  Q.  How about the younger boy?

3  A.  Well, as I say, the younger boy was about 4, and I don't

4  think he was cognizant of the situation other than he was away

5  from his parents.  It could have been for any reason, but he

6  wanted to be back with his parents.

7          I don't know what the effect that would have on him

8  now, but I think it would be a terrible situation for him, to

9  be honest with you, not to have his parents.

10  Q.  Did the younger boy have some behavioral problems when he

11  was in at least some of the foster homes?

12  A.  Oh, yes, he did.  He was very hyper.  He was diagnosed

13  ADHD and a number of other symptoms he had.  He was on meds, a

14  lot of meds, and yes, he was.

15  Q.  While you were working as the advocate for the children,

16  did there come a time where there was some allegations of

17  abuse by Jennifer towards the younger boy?

18  A.  Yes.

19  Q.  Do you know what became of that?

20  A.  Well, first of all, I only knew it as a rumor then.  When

21  I inquired where the rumor came up, I understood it was just

22  hearsay.

23  Q.  Did you learn how OCY or the Office of Children and Youth

24  treated those allegations?

25  A.  Well, they were dropped.  I think the charges were

John Horner - Cross by Ms. Sanner

1   dropped.

2   Q.   Did the fact that those allegations were made alter your

3   opinions that you have given here?

4   A.   No, not one bit.

5                MR. PATTON:  Those are all the questions, Your

6   Honor.

7                THE COURT:  Cross-examine.

8                       CROSS-EXAMINATION

9   BY MS. SANNER:

10  Q.   Mr. Horner, in your role as a CASA volunteer, you don't

11  have any professional experience in the criminal justice

12  system?

13  A.   No, I do not.

14  Q.   You wouldn't have any experience in fashioning what would

15  be an appropriate sentence for any particular defendant?

16  A.   Sentencing, no, I would not.

17  Q.   And you don't have any particular experience on child

18  development or child psychology?

19  A.   No.  We had ten weeks of training before we became a CASA

20  volunteer and was sworn in by a judge.

21  Q.   Would you agree with me probably most four-year-olds would

22  want to be with their mommy and daddy?

23  A.   Yes.

24  Q.   You would agree with me that's probably true even when the

25  mommy and daddy might be abusing the child?

John Horner - Cross by Ms. Sanner

1  A.  I'm sure that's a reasonable fact, yes.

2  Q.  You testified that the older son was often upset?

3  A.  Yes.

4  Q.  Do you know that the older child made allegations that the

5  defendant exposed her breasts to him and kissed him?

6  A.  Yes, I knew that.

7  Q.  Do you know that the investigation that was conducted in

8  Hawaii revealed that the child told Child Protective Services

9  that the defendant touched his penis, exposed her breasts and

10  vagina to him?

11  A.  Yes.

12  Q.  And you knew that abuse took place over a six-month

13  period?

14  A.  Yes, I did.

15  Q.  You know then, also, the defendant later admitted to this?

16  A.  Yes.

17  Q.  She admitted showing her breasts to her son and kissing

18  him?

19  A.  Yes.

20  Q.  She admitted that her son had lain upon her and rubbed his

21  penis on her vagina?

22  A.  Yes.

23  Q.  And you have no reason to believe those allegations are in

24  any way unfounded?

25  A.  No.

**John Horner - Cross by Ms. Sanner**

1    Q.   In fact, the defendant admitted to them?

2    A.   Yes.

3    Q.   And she received a good deal of individual and family

4    therapy in Hawaii?

5    A.   Yes.

6    Q.   And none of that changes your opinion on whether the

7    defendant should be with her children today?

8    A.   Not in the least.   That happened, I think, about ten years

9    ago, I believe even longer.

10    Q.   Does '98, '97 sound about right?

11    A.   Yes.

12    Q.   Are you aware that when the defendant moved to

13    Pennsylvania, there was a current investigation against her

14    for possessing child pornography?

15    A.   Yes.

16    Q.   Do you know there was an outstanding arrest warrant for

17    her while she was here in Pennsylvania?

18    A.   Yes.

19    Q.   Do you know that she pleaded guilty to possessing these

20    images of child pornography?

21    A.   Yes.

22    Q.   And these images showed children before the age of puberty

23    engaging in sexual explicit conduct with adults?

24    A.   I didn't know that.

25    Q.   Knowing that, does that change your opinion on whether

John Horner - Cross by Ms. Sanner

1   these children should be with this defendant?

2   A.  No, it does not because as I say, I think that happened

3   ten, eight, nine, ten years ago, and I think the boys still

4   want to be reunified with their parents.

5   Q.  Even if it's not in their best interest?

6   A.  I think it is in this case.

7   Q.  You do.  Do you know some of those pictures to which the

8   defendant has pled for which she is being sentenced today

9   showed pictures of children engaged in sadistic and

10  masochistic activities?

11  A.  No.

12  Q.  Did you know some of those pictures showed children that

13  were bound, gagged, and that were chained from ceilings?

14  A.  No, I did not.

15  Q.  That doesn't change your viewpoint today, does it?

16  A.  No.

17  Q.  Because that happened ten years ago?

18  A.  Right.

19  Q.  Do you know when the defendant was arrested here in

20  Pennsylvania she had a computer on and running in the house?

21  A.  Yes.

22  Q.  Do you know that that computer investigators believe

23  contained images of child pornography?

24  A.  Well, I heard about that.  I don't know if that was ever

25  confirmed or not.

John Horner - Cross by Ms. Sanner

1   Q.   So the fact there is currently a continuing investigation

2   on the computer that was found in 2003 in the Defendant's home

3   running in her living room may be containing child

4   pornography, does that change your opinion today on whether

5   she should be reunited with her youngest child?

6   A.   No, it doesn't because as you said, it was maybe on that

7   screen.

8   Q.   You're aware the younger child made allegations that his

9   mother sexually assaulted him?

10  A.   I'm not aware of that.  That was part of that rumor I

11  think and hearsay.

12  Q.   You're aware that she was arrested for sexually assaulting

13  that child?

14  A.   When was that?

15  Q.   That was in December of 2003.  Did you know she was

16  arrested in December of 2003 for conduct that she took on to

17  her younger child?

18  A.   I don't think I was.

19  Q.   You just thought it was rumors?

20  A.   I'm not sure.

21  Q.   Do you know that part of what the child told the DA's

22  office and part of that investigation was mommy hurts my

23  pee-pee?

24  A.   I heard that.

25  Q.   So you don't know that the child himself told

John Horner - Cross by Ms. Sanner

1   investigators my mommy squeezed my pee-pee really hard, my

2   real mommy and daddy?

3   A.   I thought that information came from the home where the

4   kid was placed.  That is where the rumor was issued I thought.

5   Q.   When the child was in a foster care home, those charges

6   arose.  The charges were not with the foster parent who had

7   the child, it was that mommy abused the child, did you know

8   that?

9   A.   I heard that, but I still don't think it was a fact.

10  Q.   Okay.  So that doesn't change your feeling today just

11  because she has been arrested for potentially abusing this

12  child, that doesn't change your opinion on whether or not she

13  should be with that child today?

14  A.   No, it does not.

15  Q.   You don't believe that child would be better off if his

16  mother had his custody?

17  A.   Yes, I do.

18  Q.   You also said there are grandparents in Philadelphia?

19  A.   Yes.

20  Q.   Those grandparents have shown an interest in the child?

21  A.   Yes.

22  Q.   And those grandparents could potentially be available to

23  take care of this child?

24  A.   That's what I understand, yes.

25  Q.   And the older child is of the age of majority, he is 18?

John Horner - Redirect by Mr. Patton

1   A.   Yes.

2              MS. SANNER:  I have nothing further.

3                    REDIRECT EXAMINATION

4   BY MR. PATTON:

5   Q.   Mr. Horner, you were asked on cross-examination about

6   Sean's anger.

7   A.   Yes.

8   Q.   Has Sean's anger ever been directed at his mother?

9   A.   No.  Never.  Never.

10  Q.   Where is the anger directed?

11  A.   The anger basically was directed to the system I'd say.

12  In other words, he just felt the problem happened ten years

13  ago or whenever it was in Hawaii and that he said does anybody

14  think my mother is going to molest me.  This kid is a 6'1"

15  football player, and that is what he said to me one time.

16  That's just not going to happen.

17              My mother is not ever going to do anything like

18  that to me again.  He felt it was something that happened in a

19  mental state, as I recall he said it, at the time.

20  Q.   Since the time that abuse occurred between Jennifer and

21  Sean, are you aware if Jennifer had worked through both Child

22  Protective Services in Hawaii and the Office of Children and

23  Youth here to address issues?

24  A.   Yes.

25  Q.   Does that knowledge play a part in your position that

John Horner - Recross by Ms. Sanner

1    despite the fact these things happened, it would be in the

2    best interest of the child to now be with Jennifer?

3    A.   Yes, I do.

4    Q.   And with regards to the allegations about Jennifer's

5    alleged abuse of Zachary, it's your understanding OCY found

6    those charges to be unsubstantiated?

7    A.   Yes, I did.

8    Q.   The criminal charges against Jennifer were dropped?

9    A.   Yes.

10              MR. PATTON:  No further questions.

11              MS. SANNER:  Just very briefly.

12                   RECROSS-EXAMINATION

13   BY MS. SANNER:

14   Q.   You don't know why the DA's office chose not to pursue

15   against Jennifer the charges that her son made in 2003?

16   A.   No.

17   Q.   You do know the younger child has had repeated therapy to

18   address aggressive and sexually acting out behaviors?

19   A.   Yes.

20   Q.   That he's had counseling to address abuse that was

21   allegedly perpetrated by his parents?

22   A.   Yes.

23   Q.   And that the OCY removed the toddler from his foster home

24   because he was humping things and acting in a sexual

25   aggressive way?

Robert Pettis - Direct by Mr. Patton

1  **A.**  Yes.

2          MS. SANNER:  Nothing further.

3          THE COURT:  Thanks, Mr. Horner.  Let me say you

4  sound like a wonderful volunteer, and I appreciate your

5  conscientious efforts.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  I did receive a number of letters

8  through Mr. Patton, and I have read them all.

9          MR. PATTON:  Your Honor, our next witness is Robert

10  Pettis.  Since Mr. Horner is done testifying, may he be

11  allowed to stay and watch the rest of the proceedings?

12          THE COURT:  Sure.

13      **ROBERT B. PETTIS, JR., DEFENSE WITNESS, WAS SWORN.**

14          THE COURT:  Have a seat up here, please, and give

15  us your name and spell your last name.

16          THE WITNESS:  Robert B. Pettis, Junior.

17  P E T T I S.

18                      DIRECT EXAMINATION

19  BY MR. PATTON:

20  **Q.**  Mr. Pettis, where do you work?

21  **A.**  Erie County Office of Children and Youth.

22  **Q.**  What do you do there?

23  **A.**  I'm an ongoing case worker in the sexual abuse unit.

24  **Q.**  How long have you been doing that?

25  **A.**  Almost 14 years.

**Robert Pettis - Direct by Mr. Patton**

1   Q.   How long have you been with OCY?

2   A.   Almost 14 years.

3   Q.   Just can you give us fairly brief, just a summary of what

4   that job entails?

5   A.   The sexual abuse unit is responsible for taking cases that

6   come through the agency primarily involving sexual assault

7   either of the child by the parent or the child by another

8   sibling or a child by another person in the community

9   formulating a program by which that child's care can be

10  assessed and then addressing that through therapy.

11          We have worked in conjunction with family services

12  to develop a safety program with regards to children and their

13  parents.

14  Q.   As part of your job there at OCY, were you assigned to

15  work on the case involving Jennifer and Darren Holland?

16  A.   That's correct.

17  Q.   And did you work with the Hollands' two sons?

18  A.   That's correct.

19  Q.   And for lack of a better way to put it, were you the case

20  worker for the two boys?

21  A.   Yes.

22  Q.   How did you guys get involved with them?

23  A.   According to the information written by the in-take

24  worker, the agency was called by the city police that they had

25  two minor children who needed to be evaluated and taken into

Robert Pettis - Direct by Mr. Patton

1    care, I believe, June of 2003.

2              At that time the in-take worker arrived to evaluate

3    the situation.  At that particular time the two children were

4    taken into care.

5    Q.  After they were taken into care, did you have contact with

6    the children's parents, Jennifer and Darren, to try and start

7    deciding how you were going to handle the case?

8    A.  I received the case July 17.  At that particular time I

9    began to evaluate the situation with regards to the

10   allegations, as well as the information that had been received

11   by the agency in Hawaii that had been involved in this

12   particular case.

13   Q.  The information you got from Hawaii, what was contained in

14   that information?

15   A.  There were reports from the Department of Child Welfare

16   that developed the case, how they entered into the care of

17   Sean, who I believe was 12 at the time, why they took him into

18   care.

19              They also developed a case of the services that

20   would be provided to the parents to possibly return Sean to

21   their care.  There was also police reports that were provided.

22   Q.  Did the information you receive from Hawaii indicate how

23   Hawaii's case progressed with Jennifer and the older boy, and

24   we don't need to refer to the boys by name?

25   A.  As I understand it, the agency had requested that

Robert Pettis - Direct by Mr. Patton

1   Mr. Holland not allow Mrs. Holland to maintain care of the

2   children or actually the child at that particular time because

3   it was not a response.

4          The child was removed, put in care of the agency,

5   and adjudicated dependent at that time.  At that time the case

6   worker developed a plan, a family service plan in which there

7   was parenting classes for Mr. and Mrs. Holland, there was

8   psychological therapy for Mrs. Holland.

9          I believe they also referred to medical management,

10  particularly for Mrs. Holland.  I believe that occurred in

11  April -- I can't remember that particular year, I believe

12  1999.

13         At that point they participated in therapy,

14  parenting classes in Hawaii for the therapy, which was

15  individual in nature.  They did do some couple's counseling as

16  I recall, and that continued until November of that year, at

17  which time the agency in Hawaii returned the children, at

18  least the one child to their care.

19  Q.  And then after the older child was returned to the care in

20  Hawaii, I think it's called Hawaii Children Protective

21  Services, they ended up closing their case there?

22  A.  They believed there was no ongoing need to maintain the

23  case as structured by their expectations, and they closed the

24  case, I believe, the following year.

25  Q.  From reviewing the records from Hawaii, your reviewing

Robert Pettis - Direct by Mr. Patton

1    them and looking into it, did it appear to you that Jennifer

2    did everything that the Hawaii Children Protective Services

3    asked her to do to work through the problems to get her child

4    back?

5    A.   According to the information as provided by Hawaii that

6    was completed by, I believe, October of the year that they

7    took Sean, they returned Sean -- oops, sorry.  Can't help it.

8    They returned the child to their care in November of that

9    year.

10   Q.   Through your interaction with Jennifer and Darren for that

11   matter, did Jennifer -- was she actively trying to get her

12   children returned to her?

13   A.   Jennifer participated in every aspect of the court order

14   that was established by the Erie County Court.  She responded

15   to everything that we requested.

16   Q.   Is it accurate to say that within about a month or so of

17   when the children were taken into OCY's custody, OCY's

18   recommendation was that the children be found dependent but

19   returned to the home?

20   A.   That would be accurate.

21   Q.   But that the judge handling the case disagreed with that?

22   A.   That's correct.

23   Q.   And in total, how long were the children in foster care?

24   A.   They were in care I believe from July -- I take that back.

25   In June of 2003 until September of 2004.

Robert Pettis - Direct by Mr. Patton

1    Q.   And the return to the home was -- was that due to a ruling

2    by the Pennsylvania Superior Court reversing the trial court's

3    order that the children be kept in foster care?

4    A.   That's correct.

5    Q.   While the children were in foster care, did Jennifer stay

6    involved with the children?

7    A.   Yes.

8    Q.   In what ways?

9    A.   There was a mandated visitation that they participated in.

10   We could only provide X number of visits due to limitations

11   within the agency.  They participated in every opportunity to

12   visit with the children.

13   Q.   Did they try and help out with the needs of the children,

14   the everyday needs of the children while they were in foster

15   care?

16   A.   Yes.

17   Q.   Would they try and buy things for the children?

18   A.   Yes.

19   Q.   Based on your interaction with the children and with

20   Jennifer and Darren, do you feel there's a strong bond between

21   the children and Jennifer?

22   A.   Yes.

23   Q.   Does it appear to you that the children have a strong bond

24   and care for Jennifer?

25   A.   Yes.

**Robert Pettis - Direct by Mr. Patton**

1    Q.    Do they appear afraid of Jennifer in any way?

2    A.    No.

3    Q.    When the children were in foster care, did the younger

4    child have problems, behavioral problems in foster care?

5    A.    Yes.

6    Q.    What type of problems did he have?

7    A.    There were significant behavior issues regarding striking

8    other children, striking adults.  There were times where he

9    was -- would act sexually with ambient objects, there was

10   urinating, swearing, inappropriate behaviors that the foster

11   care people, as well as the agency, had to deal with.

12   Q.    Was the younger child moved at least in part because of

13   some of these problems?  Was he moved between foster homes?

14   A.    There were multiple reasons why this young child was

15   moved.

16   Q.    How many foster homes did he end up being in?

17   A.    Three.

18   Q.    The last one that he was in, was that out in Titusville?

19   A.    Correct.

20   Q.    Did he show some improvement while he was there?

21   A.    Yes.

22   Q.    Since the children have been back with Jennifer and

23   Darren, have the behavioral problems with the younger child

24   continued?

25   A.    I have not observed those behaviors in my visits to the

1    home.  I have not received any negative reports from the

2    school district in regard to that behavior and neither have

3    the parents responded to any kind of negative comments or

4    behavior to Zachary in the home.

5    Q.  The younger child is in school now?

6    A.  Correct.

7    Q.  And you say that you have not received any calls or

8    complaints from the school regarding the younger child's

9    behavior?

10    A.  That would be accurate.

11    Q.  Would it be fair to say that you're not in the Holland

12    home obviously 24 hours a day, correct?

13    A.  That's correct.

14    Q.  Based on your experience, can you view the child's

15    behavior at school as somewhat representative of, in general,

16    the behavior they would have at home?

17    A.  I can say that I was pleased that I did not get a call

18    from the school district, not one call in regards to anything

19    negative in regards to his behavior.

20         I don't know if that would be completely indicative

21    of the behavior at home, but I know as a child welfare worker,

22    we are very pleased when we don't get a phone call from

23    someone.

24    Q.  Based on your experience as a child welfare worker and

25    experience in dealing with younger children, in your

Robert Pettis - Direct by Mr. Patton

1   experience, do they generally have the ability to

2   conscientiously control their behavioral problems based on the

3   situation that they're in?

4   A.   No.   I believe it's very difficult for a child to hide the

5   negative impact, if it's significant.   That is not to say it's

6   always true, but negative behavior will continue at a school,

7   and we have seen that occur.

8   Q.   In your opinion, how have the Hollands been doing as a

9   family unit since the children have been returned to the home?

10  A.   They have followed everything that we've expected that

11  they would do with regard to caring for the children.

12  Q.   While the younger child was in foster care, were

13  allegations made that Jennifer had sexually abused the younger

14  child?

15  A.   That's correct.

16  Q.   How did those allegations come to your attention?

17  A.   The foster mother at the time that he was residing there

18  contacted me in regards to concerns related to not only

19  sexually reactive behaviors but also made allegations in

20  regard to his mother involving a sexual nature.

21  Q.   So that came from the foster mother originally?

22  A.   That's correct.

23  Q.   What happened after that?

24  A.   The agency is required to contact Child Line, which we

25  did.   The agency is also required to -- our protocol is that

**Robert Pettis - Direct by Mr. Patton**

1    the in-take department is informed immediately of those

2    allegations.

3         The in-take worker was contacted by the supervisor

4    from in-take, and that in-take worker and myself went out and

5    interviewed the child.

6    Q.  Did you interview the child just once?

7    A.  It was multiple times.

8    Q.  Approximately how many times?

9    A.  Three.

10   Q.  What was the purpose of talking with the child?

11   A.  It's been the experience of the agency is that it takes

12   multiple times to get accurate information, particularly when

13   there's a reticence on the child.

14        In this particular situation, it was very difficult

15   to get an accurate comment from him.  I should also say if

16   something can be established on a first interview, the

17   protocol of the agency is then to hand it over to the CAC,

18   Child Advocacy Center, which they will then do an interview

19   with the child.

20   Q.  Was that done in this case?

21   A.  Yes.  It was referred to them.

22   Q.  And did you after the first time you and the in-take

23   specialist spoke with the youngster child, you talked with

24   them again?

25   A.  Yes, we did.

Robert Pettis - Direct by Mr. Patton

1    Q.   During those interviews, did you use, you or the in-take

2    interviewer use different techniques to try and get a coherent

3    and sequential complaint from the younger child?

4    A.   That's accurate.

5    Q.   Were you able to do that?

6    A.   No.   In our estimation, he was all over the place and made

7    a variety of statements regarding multiple people.

8    Q.   Based on those interviews that you and the in-take

9    specialist did, did your agency make a determination as to

10   whether the allegations were founded or unfounded?

11   A.   The in-take worker determined that the allegations were

12   unfounded.

13           MR. PATTON:   Your Honor, may I approach?

14           THE COURT:   Sure.

15   Q.   I would like to show you Defendant's Exhibit B and ask you

16   to take a look at that.   Do you recognize that?

17   A.   Yes, I do.

18   Q.   What is Defendant's Exhibit B?

19   A.   This is an official document from the agency in which they

20   write and communicate to an alleged perpetrator about the

21   culmination of an evaluation of their case.

22   Q.   And does this letter dated December 4th, 2003 and

23   addressed to Mr. and Mrs. Holland indicate that the office had

24   found the allegations of abuse unfounded?

25   A.   That's correct.

Robert Pettis - Direct by Mr. Patton

1   Q.   Do you still place children with the foster mother with

2   whom the younger child was staying at the time he made these

3   allegations?

4   A.   I personally, no.

5   Q.   Why not?

6   A.   There was some concern on my part and my supervisor's part

7   in regard to confidentiality issues.  Consequently, we have

8   chosen not to use that particular foster home.

9   Q.   Do you have at least some concerns with that foster

10   mother's relationship with the Holland's younger child?

11   A.   Yes.

12   Q.   What would those concerns be or what are or were those

13   concerns?

14   A.   The dynamics of the household presented in my mind not a

15   danger -- I won't say that -- but concerns related to the

16   ability to care for the younger child in an appropriate

17   manner.  I do not know if those issues have been resolved in

18   that foster home or have the time to do that, so consequently,

19   I don't use it.

20   Q.   The fact that the allegation of abuse against the younger

21   child were made, does that make you feel in your role that

22   it's improper for or was improper for the boys to be returned

23   to Jennifer?

24   A.   Could you repeat that to make sure I understand.

25   Q.   Is the fact that the allegations of abuse were made

Robert Pettis - Direct by Mr. Patton

1   concerning the younger child, does that cause you to believe

2   it's inappropriate for the children to be returned and to stay

3   with Jennifer?

4   A.   No.

5   Q.   Despite your agency's finding that the allegations were

6   unfounded, is it accurate to say the district attorney's

7   office went ahead and filed charges against Jennifer and

8   Darren?

9   A.   That is my understanding, correct.

10  Q.   Is it your understanding those charges were then later

11  dismissed?

12  A.   That's correct.

13  Q.   If your office felt that there was credible evidence that

14  the younger child had been abused, would you have made the

15  unfounded finding?

16  A.   I'm not an in-take worker, so I would not make that

17  determination.

18  Q.   Did you speak with Ms. Sanner yesterday?

19  A.   Yes.

20  Q.   Did you discuss with her the results of at least OCY's

21  investigation into these allegations of abuse?

22  A.   Yes.

23  Q.   Did you let her know at least your agency had found the

24  allegations unfounded?

25  A.   Yes.

Robert Pettis - Direct by Mr. Patton

1  Q.  Do you think the children are in any type of danger now

2  being with Jenner and Darren?

3  A.  As long as Mrs. Holland maintains her medication that has

4  been prescribed to her and as long as they are particularly

5  sensitive to the element of supervision, particularly with the

6  younger child, I do not believe there would be any cause for

7  alarm or risk at this time.

8  Q.  Has Jennifer, since the children have been returned, has

9  she, as far as you know, been on her medications and acting

10  responsibly?

11  A.  I believe that she has followed the medical management

12  that was prescribed by the physicians.

13  Q.  Is it accurate to say that she has had some struggle with

14  getting her medications, I guess, getting the right

15  medications and the right dosages?

16  A.  According to my observation, that would be correct.

17  Q.  Does she appear to you based on your recent visits, does

18  she appear to be doing well?

19  A.  She appears to be animated.  Her affect from my

20  observation would be positive.  That would be my observation

21  of the most recent contact.

22  Q.  Now, are you aware at the time Jennifer was arrested back

23  in June of 2003, that there were at least allegations there

24  were images of child pornography found on a computer in the

25  home?

**Robert Pettis - Direct by Mr. Patton**

1    A.   That's correct.

2    Q.   And has that been discussed by you with the Hollands

3    through your work with them?

4    A.   Correct.

5    Q.   And have you talked with them about that?

6    A.   What do you mean talk?

7    Q.   Let me ask you this.  Have you expressed your concern and

8    disapproval of having even adult pornography on the computer?

9    A.   I thought it was inappropriate to have a computer in the

10   home, and I made that very clear.  I told them that I felt

11   they put their children at risk because of them.

12   Q.   During your interviews, did the Hollands inform you that

13   any pornography that was on the computer was as a result of

14   Darren's use and not Jennifer's?

15   A.   He has made those statements to me, that's accurate.

16   Q.   Has he also made the statements to you as to whether or

17   not Jennifer approves of him having that material?

18   A.   He made statements to me stating that he was the one who

19   would use the computer.  The older boy would also use the

20   computer but had locks on it so he could not engage in the

21   pornographic material.  He stated to me that Jennifer would

22   never touch the computer because of fear, still, I felt it put

23   the family at risk in having the computer.

24   Q.   When you have been involved with the Hollands, when you

25   have been there, have they ever had a computer in the home?

Robert Pettis - Direct by Mr. Patton

1    A.  No.

2    Q.  It is accurate to say that your file on the older boy, if

3    it hasn't already been terminated, will be in the near future

4    given the fact he has reached the age of 18?

5    A.  That's correct.

6    Q.  If Mrs. Holland were not taken out of the home, what at

7    least was your plan with regard to the file on the younger

8    boy?

9    A.  I have to qualify that answer because of information that

10   recently was received.  The ongoing investigation regarding

11   Mr. Holland tempers the agency's plan on terminating the case

12   at the end of August.

13           We would have followed the case no matter what

14   happened in the sentencing here today, only because summertime

15   is a very difficult time for children, and when there is some

16   consistency through school, it settles them down.

17           So we were going to maintain contact with the

18   family through the end of August into September and then close

19   it at the appropriate time in September.  Due to those

20   concerns related to Mr. Holland's potential ongoing

21   investigation, in talking it over with the in-take supervisor,

22   we'll wait until my supervisor returns from medical leave

23   before an accurate time can be presented.

24           My feeling is that we'll maintain the case just to

25   assure protection for a period of time.

**Robert Pettis - Direct by Mr. Patton**

1    Q.  Were you given any indication as to how much longer the

2    investigation in Mr. Holland may continue since it has been

3    going on for two years now?

4    A.  No.  There's no indication as to when that time period

5    might be.

6    Q.  Do you have any concerns about the impact Ms. Holland's

7    removal from the home may have on the younger child?

8    A.  Any time a parent is removed for a variety of reasons,

9    there is an emotional impact on the children, particularly

10   those who are of the younger child's age.

11             I believe that it would be detrimental to this

12   child or any child removed for whatever reason.

13   Q.  If the child has already previously been separated from a

14   parent and they are separated again, can that cause additional

15   concerns?

16   A.  Literature speaks to the impact through reactive

17   attachment disorder, which we have seen multiple times with

18   children in foster care who have been removed for extended

19   periods of time.

20             The impact on them is way beyond those months and

21   years that the separation has occurred.  It impacts a child

22   for many years.

23   Q.  And the more separations or the longer those separations,

24   the more acute the problem?

25   A.  I believe the literature speaks to that only as to the

Robert Pettis - Cross by Ms. Sanner

1  number of times, the length, the age of when those separations

2  occur.  Even as young as 18 months, separation can cause

3  issues regarding attachment disorder.  Consequently, there is

4  concern, no matter what reason, when the child is separated

5  from the parent.

6            MR. PATTON:  Your Honor, those are my questions.

7                    CROSS-EXAMINATION

8  BY MS. SANNER:

9  Q.  Your office OCY found it appropriate to refer the younger

10  child's December 2001 claim to the Children Advocacy Center?

11  A.  Yes.

12  Q.  Your office claimed to believe the allegations made by the

13  young son were unfounded?

14  A.  That is correct made by the in-take worker.

15  Q.  Does unfounded mean the same as false?

16  A.  No.

17  Q.  Isn't it true that unfounded can actually mean a variety

18  of things?

19  A.  Correct.

20  Q.  And do you find that children often make false allegations

21  of sexual molestation by a parent?

22  A.  You say often?

23  Q.  Yes.

24  A.  I'm thinking about it.  I'm sorry to take so long.  I

25  would have to say through my experience, that usually it is

Robert Pettis - Cross by Ms. Sanner

1    more consistent when there is a stepparent involved versus a

2    biological parent, although -- good question.

3    Q.  I don't necessarily understand the difference you are

4    making between a stepparent and a biological parent.  Could

5    you explain that?

6    A.  I'm just using my experience as the way of defining.

7    Q.  Do you find that a child often makes a false allegation of

8    sexual misconduct by a biological parent?

9    A.  No.

10   Q.  This particular child, the younger son in December of 2003

11   made an allegation against his mother?

12   A.  Correct.

13   Q.  He did not make an allegation against his foster mother?

14   A.  May I qualify that previous answer?

15   Q.  Yes.

16   A.  The information we gathered or that was given to us is

17   that the foster parent stated that the child had made those

18   allegations in regard to the mother.  Those were, when

19   investigated by the in-take worker and myself, were

20   inconsistent.

21   Q.  So if I'm getting this right, it was the foster mother's

22   statement, hey, the younger child told me that mommy is

23   abusing?

24   A.  That's correct, and they are considered mandated reports

25   since they are foster parents, and consequently, that is why

Robert Pettis - Cross by Ms. Sanner

1   it initiated the investigation.

2   Q.  So this foster mother reported that the child made this

3   statement to her?

4   A.  As mandated by law.

5   Q.  Now, you said confidentiality issues regarding the foster

6   mother.  You don't for a second believe that the foster mother

7   was sexually abusing this child, do you?

8   A.  I don't believe she did, no.

9   Q.  But the child made an allegation that his mother was

10  abusing him?

11  A.  Yes, he did.

12  Q.  And this problem, this sexual abuse by the parent wasn't

13  discovered until the child was placed in foster care?

14  A.  That's accurate.

15  Q.  It was about six months after the child was placed in

16  foster care that he made the allegation?

17  A.  Correct.

18  Q.  So maybe it took a little time to feel safe in an

19  environment before making an allegation, is that possible?

20  A.  It is possible.

21  Q.  Are you aware that an order by Judge Domitrovich

22  terminated the parental rights here?

23  A.  She terminated parental rights?

24  Q.  Yes.  Are you aware of an order that stated that?

25  A.  If she terminated parental rights, it never came to my

Robert Pettis - Cross by Ms. Sanner

1    office.

2    Q.   Maybe I misspoke.  She refused to send the children back

3    to the parents?

4    A.   That's correct.

5    Q.   And you know that the district attorney's office

6    investigated the charges that the younger child made?

7    A.   That's correct.

8    Q.   Do you know that the district attorney's office filed that

9    a child who is three years old at the time is too young to

10   testify?

11   A.   I believe that's their protocol.

12   Q.   Do you know when this child was four, he was still wearing

13   diapers and was delayed in speech?

14   A.   Diapers, yes.  Delayed in speech there, I believe with

15   Dr. Potter, who evaluated him, I don't know if it was delay in

16   speech, but there were speech problems with him.  I'm not

17   sure -- I don't know if it was delayed.  There was a speech

18   issue that he saw Dr. Potter for, I believe.

19   Q.   So at the time he made the allegations then, even for a

20   year after, he was having speech problems and was remaining in

21   diapers until he was four?

22   A.   Yes.

23   Q.   Do you know that the child told investigators, this is the

24   younger child, that mommy hurt my pee-pee?

25   A.   That was the information that was given to the agency.

**Robert Pettis - Cross by Ms. Sanner**

1  Q.  Did you know that the child said this happened in their

2  bedroom, that they used their hands, and that mommy squeezed

3  my pee-pee real hard?

4  A.  That information was not provided to the agency.

5  Q.  But would that information today change your view on

6  whether this child should be returned to its mother?

7  A.  No.

8  Q.  So you're saying that the child's allegations were

9  unfounded?

10  A.  Correct.

11  Q.  Not necessarily false, but unfounded?

12  A.  Correct.

13  Q.  Do you know, also, that the older son made allegations of

14  sexual abuse by the mother?

15  A.  Correct.

16  Q.  That the defendant exposed her breasts to him and kissed

17  him?

18  A.  Correct.

19  Q.  And that the boy told Child Protective Services in Hawaii

20  that the defendant when he was ten or eleven years old touched

21  his penis?

22  A.  Correct.

23  Q.  Exposed her breasts and vagina to him?

24  A.  Correct.

25  Q.  And the abuse took place over a six-month period?

Robert Pettis - Cross by Ms. Sanner

1  A.  I'm not sure about a six-month period.  I'm not sure how

2  long it was.  I don't recall reading that in the report.

3  Q.  For some period?

4  A.  Yes.

5  Q.  Do you know the defendant later admitted to showing her

6  breasts and kissing him?

7  A.  Yes.

8  Q.  And she also said her son had lain on her and rubbed his

9  penis on her vagina?

10  A.  Correct.

11  Q.  But that doesn't change your opinion as to how she should

12  be sentenced in this case or if she should receive probation.

13  You still believe she should still be with the kids?

14  A.  Yes.

15  Q.  You are aware that the older child didn't reveal these

16  allegations that his mother was sexually molesting him until

17  he was 11 years old?

18  A.  That would be accurate.

19  Q.  And he didn't reveal it in a school environment?

20  A.  That's accurate.

21  Q.  He revealed it to his father?

22  A.  That's true.

23  Q.  And as far as you know, nobody in the school environment,

24  up until the time the kid told his dad, acted on this for the

25  information that you have?

**Robert Pettis - Cross by Ms. Sanner**

1   A.   I believe the situation that there were behavioral queues

2   that the school district missed, and if you would look back

3   into the documentation, there was behavioral issues for a

4   couple of years that would indicate not only a possibility of

5   inappropriate behavior but also other behavioral issues

6   regarding the family.

7   Q.   Are you satisfied with how the Hawaii agency handled this

8   case?

9   A.   We would not have functioned in the same way.

10  Q.   Would your office have removed the younger son once the

11  allegations of child molestation against the older son and

12  child pornography was found in the home?

13  A.   Immediately.

14  Q.   But your testimony today is that the mother did all that

15  Hawaii asked her to do?

16  A.   Correct.

17  Q.   And that's a satisfactory reason they should be returned

18  to her today?

19  A.   It is not only information from Hawaii, but also verbal

20  communication between that case worker and myself that

21  involved progress the family made.  They were very confident

22  in what had occurred regarding not only the parenting classes,

23  but the therapeutic aspect of the family.

24  Q.   So you weren't happy with how Hawaii handled it, but they

25  said it was done, and that was kind of good enough?

**Robert Pettis - Cross by Ms. Sanner**

1   A.  As stated, we would have taken the child immediately

2  because to remain in that care, again, remains in our mind a

3  very dangerous situation.

4   Q.  In fact, when Hawaii actually removed the son from the

5  home, the older son?

6   A.  Yes, it was a risky situation.

7   Q.  And child pornography was found in the home?

8   A.  I don't know if it was at that time or if it was before he

9  was actually removed.  I'm not sure when they found the child

10  pornography.

11   Q.  Those are the charges we are here about today.  She

12  went -- after those charges were made, child pornography was

13  found in her home, and she admitted it was hers?

14   A.  Yes.

15   Q.  And the defendant's husband turned over five floppy disks

16  containing child pornography to investigators?

17   A.  Yes.

18   Q.  We are not here because her older son made charges more

19  recently or younger son made charges recently?

20   A.  That's my understanding.

21   Q.  You know the individual and family received more treatment

22  after the older son talked to authorities in Hawaii?

23   A.  Yes.

24   Q.  Did you know there was a pending investigation against the

25  defendant when she arrived in Pennsylvania?

Robert Pettis - Cross by Ms. Sanner

1   A.   I only knew that after the case was given to us, that that

2   occurred, yes.

3   Q.   But you know now when she left Hawaii, there was a pending

4   active case against her?

5   A.   Yes.

6   Q.   Did you know she had arranged to plead guilty in Hawaii?

7   A.   My understanding was that she pled guilty here and

8   had -- my understanding was she had planned to fight the

9   allegations in Hawaii.  That was my understanding.

10  Q.   Well, we're here today on allegations that arose out of

11  Hawaii, which she did plead guilty to?

12  A.   Yes.

13  Q.   I was asking if you are aware she agreed in Hawaii she was

14  going to plead to those charges?

15           MR. PATTON:  That's not factually accurate.  There

16  was never a signed agreement.  There were negotiations going

17  on between attorneys, but there was never any signed plea

18  agreement or set date for any plea agreement.

19           MS. SANNER:  I'll move on, Your Honor.

20  Q.   Are you aware that authorities in Hawaii did not know

21  where she was?

22  A.   I know that now.

23  Q.   Are you aware there was an outstanding arrest warrant

24  against her out of Hawaii since 2002?

25  A.   I knew that after the arrest, yes.

**Robert Pettis - Cross by Ms. Sanner**

1    Q.   Are you aware when she left Hawaii, she faced continuing

2    monitoring of her home situation?

3    A.   The information that they provided was the fact that they

4    believed information was given to their attorney, and that's

5    what I was informed with.  I was not informed that information

6    you provided.

7    Q.   Maybe I wasn't clear.  When Hawaii authorities closed the

8    case against the family for the older child, she would have

9    had continued monitoring to look forward to in Hawaii?

10   A.   I would assume so.

11   Q.   She didn't have any here in Pennsylvania because nobody

12   knew she was here?

13   A.   That's correct.

14   Q.   The arrest warrant was finally executed in 2003?

15   A.   I believe so.

16   Q.   And you know that at that time investigators found child

17   porn, what appears to be child porn on the computer that was

18   in the family home running?

19   A.   That's correct.

20   Q.   And you know that there's a current investigation on this

21   computer, which is being analyzed forensically?

22   A.   Yes.

23   Q.   Did you know there is up to 28,000 images on this

24   computer?

25   A.   Of child pornography?

Robert Pettis - Cross by Ms. Sanner

1  Q.  Images that could be child pornography on this computer.

2  A.  I knew there were a lot of images.

3  Q.  Does that change your opinion that in 2003, when she was

4  arrested, she had a computer in her home that may have had

5  child pornography on it?

6  A.  My -- I apologize for changing direction.  My

7  understanding is that there were older, 2000, images of adult

8  pornography.  There were a number of child pornography

9  pictures on, but they were not certain how they got there.

10  That was the testimony given to me.

11  Q.  So the mere fact that these images, whatever they happened

12  to be were on the computer when she was arrested in 2003 in

13  her home, that doesn't change your opinion on whether she

14  should be reunited with her child today?

15  A.  I believe the decision that we made back in September of

16  2004, based on our thought patterns in August of 2003, are

17  still consistent with the levels of imposed of risk as stated,

18  the Pennsylvania Code for risk management.

19  Q.  And you're glad you haven't received a recent phone call

20  from the school?

21  A.  Very much so.

22  Q.  Since the child has been returned to the parents, there

23  haven't been any more reports?

24  A.  From?

25  Q.  From the parents or anybody else saying that the child is

Robert Pettis - Cross by Ms. Sanner

1  acting out in a sexually aggressive way?

2  A.  We received nothing from the parents, nothing from the

3  school, nothing that we have observed.

4  Q.  But from 2003, June 2003, when the child was taken from

5  the parents, up until September 2004, when the child was

6  returned, there had been continuing reports that the child was

7  acting out in a sexually aggressive way?

8  A.  Yes.  That began in August of 2003, the first foster home,

9  and we removed both children from that residence.  The

10  behavior for Zachary was reduced for about 45 days and then

11  came back much more violently.

12          We removed him to the third foster home at that

13  time and initiated play therapy.  The third foster home was

14  able to address and monitor the behavior, and they reduced to

15  the point that the play therapist, prior to my leaving on a

16  medical leave, had decided that play therapy was no longer

17  needed.

18  Q.  So reports in therapy up until December 2004, kids are

19  returned, and no more reports?

20  A.  Not that we have received.

21  Q.  As a general rule, you believe that children should remain

22  with their families?

23  A.  It's a very significant balancing act that a child

24  protective worker engages in.

25  Q.  You acknowledge it would hurt any child to be without

**Robert Pettis - Cross by Ms. Sanner**

1  their mother?

2  A.  Absolutely.

3  Q.  But it might not be in the child's best interest to be

4  with any mother?

5  A.  That's correct.

6  Q.  The images that were possessed in this case, the images of

7  child pornography, are you aware they showed children,

8  prepubescent children engaging in sex acts with adults?

9  A.  I did not receive all the information from the special

10  agent involved.  I just heard recently about the information

11  that was on the computer.

12  Q.  And that at least one of those images shows a sadistic,

13  masochistic image?

14  A.  I was not aware of that by the special agent.

15  Q.  This image specifically shows a child who was bound,

16  gagged, and hangs chained from a ceiling.  You weren't aware

17  of that?

18  A.  No.

19  Q.  Does that change your opinion?  Knowing that to be true,

20  do you still believe this child should be returned to this

21  mother?

22  A.  Understanding the fact that this occurred in our opinion

23  in Hawaii, I believe the year was 1998, the fact that she had

24  participated in therapy to address this and that she's

25  attempted medical management, which has reduced the risk to

Robert Pettis - Cross by Ms. Sanner

1   where the benefits of contact and permanency would outweigh

2   the potential risks.  There will always be risks, but it's

3   reduced the risk.

4   Q.  As far as the images of the children that she possessed,

5   you would acknowledge that those children certainly were hurt

6   by her contact?

7   A.  From the images were hurt?

8   Q.  The children depicted in those images and going through

9   what they went through to have those pictures taken at that

10  time were hurt?

11  A.  Absolutely.

12  Q.  You would describe this mother as different?

13  A.  We are talking about Ms. Holland being different in

14  regards to --

15  Q.  Different in regards to mothers in general, I suppose.

16  A.  Her behavior in viewing the material is reprehensible and

17  not normal.  From my experience as a child welfare worker, my

18  observation of her since that time would be a more normalized

19  relationship; however, I cannot be there 24/7, but the

20  indication of participation, follow-through with contact with

21  physicians at this point would lead me to state that risk is

22  reduced; and normalization of behavior from our observation

23  had occurred.

24  Q.  Despite the fact that this is a mother that possessed

25  admittedly images of child pornography, some of it sadistic,

Robert Pettis - Cross by Ms. Sanner

1    some of it masochistic, sexually assaulted her son ten years

2    ago and had an arrest for sexually assaulting the younger son

3    within the past couple years, your risk/reward is still going

4    towards sending the mother back?

5    A.  My observations over a period of time, watching the family

6    dynamics in general, those most able to address normalcy

7    address the needs which can be maintained over an extended

8    period of time.

9            Those who are not able to fail.  That is why we

10   have continued contact.  It's my experience that they have

11   maintained appropriate interaction with their children since

12   September of 2004 and, consequently, have made a safe

13   environment for the children.

14   Q.  So your view is that the interaction has been appropriate?

15   A.  That we're aware of, yes.

16   Q.  But in no way that I can imagine or in any way describe

17   this mother as being extraordinary in a positive sense?

18   A.  No.

19            MS. SANNER:  Thank you.

20                 REDIRECT EXAMINATION

21   BY MR. PATTON:

22   Q.  Is Ms. Holland's dedication to her children extraordinary

23   compared to the number of families you have to deal with?

24   A.  Most parents really do love their children.  Capability to

25   maintain that and maintain care is not always there.

**Robert Pettis - Redirect by Mr. Patton**

1          From my observation, and I have been limited, I

2    will admit, from September 2004 to this date, my observation

3    from that point is they have been consistent with both

4    children, imperfect, accurate.  That would be my position.

5    Q.  I am going to talk about some of the allegations of abuse

6    regarding the younger child because you were asked a number of

7    questions about that.

8          You were asked if a child often makes false

9    allegations against a biological parent.  Have you had

10   instances where children made what you believe were false

11   allegations of sexual abuse against parents?

12   A.  Yes.

13   Q.  Are children sometimes susceptible to suggestions

14   regarding whether or not they have been abused?

15   A.  Sometimes.

16   Q.  The younger child was in three separate foster homes, is

17   that correct?

18   A.  Correct.

19   Q.  He didn't make any allegations of abuse against his mother

20   while he was in the first foster home, is that correct?

21   A.  That's correct.

22   Q.  And he didn't make any allegations of sexual abuse against

23   his mother when he was in the third foster home, is that

24   correct?

25   A.  That's correct.

Robert Pettis - Redirect by Mr. Patton

1   Q.   This occurred while he was in this second foster home?

2   A.   That's correct.

3   Q.   And your investigation revealed that the boy was unable to

4   give a consistent and coherent explanation of the alleged

5   abuse?

6   A.   That was an agency investigation, correct.

7   Q.   And you at least personally, through your role in the

8   agency, do not use this foster home any more for children of

9   the Holland's younger son's age?

10  A.   That's correct.

11  Q.   And your decision not to do that was based on the

12  experience the Holland's younger boy had while being there?

13  A.   That decision was in regard to confidentiality issues and

14  determined by my supervisor that I agreed with and complied

15  with.

16  Q.   You stated the younger child's sexually aggressive

17  behavior began some time around August of 2003, is that

18  correct?

19  A.   Actually, it was at the end of July of 2003 at the foster

20  home.  He had been there since June of 2003.

21  Q.   So the sexual aggressive behavior started about a month

22  and a half after he was in foster care?

23  A.   That's correct.

24  Q.   And then when he was in the third foster home, I believe

25  that's when they started the play therapy?

Robert Pettis - Redirect by Mr. Patton

1    A.    That's correct.

2    Q.    Did that seem to have an impact on his -- did that seem to

3    reduce the behavior?

4    A.    Yes.

5    Q.    And there hasn't been any problem reported to you by the

6    Hollands or by the school that the child has continued in that

7    sexual aggressive behavior?

8    A.    That's correct.

9    Q.    With regard to how the agency in Hawaii handled the case,

10   I believe you testified that your agency would have handled

11   the situation differently in the sense that not only would you

12   guys have removed the older son from the home, you also would

13   have removed the younger son?

14   A.    That's correct.

15   Q.    Do you feel that the treatment program that the folks in

16   Hawaii had Jennifer go through was somehow inadequate?

17   A.    We would have preferred it be longer.  We would not have

18   had that length of time.  It would have been longer.

19   Q.    You spoke personally with the case worker from Hawaii that

20   had worked with the Hollands, is that correct?

21   A.    Yes, I did.

22   Q.    Is it accurate to say that that case worker indicated to

23   you that their agency in Hawaii was satisfied after the

24   family, not only Jennifer, but also Darren, had done the

25   therapy that had been prescribed, and they were satisfied that

**Robert Pettis - Redirect by Mr. Patton**

1   the older boy would be safe in returning to the home?

2   A.  Yes.

3   Q.  As you're sitting here today if you felt the two boys were

4   not safe in the home, in Jennifer's home, would you allow them

5   to stay there?

6   A.  No.  We could not remove the older son, but we would

7   remove the younger son.

8   Q.  Are you planning to remove the younger son?

9   A.  No.

10              MR. PATTON:  Those are my questions, Your Honor.

11              MS. SANNER:  Nothing further, Your Honor.

12              THE COURT:  Thank you, sir.

13              MR. PATTON:  We have no further witnesses, Your

14   Honor.

15              THE COURT:  Ms. Sanner, any witnesses?

16              MS. SANNER:  Just one.

17              MR. PATTON:  I would move for the admission of

18   Defendant's Exhibit B.

19              THE COURT:  B is admitted.  Was there an A?

20              MR. PATTON:  There was an A attached to our --

21              THE COURT:  Okay.  That's the opinion of the

22   Superior Court.

23              MR. PATTON:  That's correct.

24              MS. SANNER:  The Government is calling Laura

25   Guncheon.

Laura Guncheon - Direct by Ms. Sanner

1    **LAURA GUNCHEON, GOVERNMENT WITNESS, WAS SWORN**

2         THE COURT:  Have a seat up here and give us your

3    name and spell your last name.

4         THE WITNESS:  Laura Guncheon, G U N C H E O N.

5                   DIRECT EXAMINATION

6    BY MS. SANNER:

7    Q.  How are you employed?

8    A.  I'm employed by the Children Advocacy Center as a case

9    manager.

10   Q.  What do you do as a case manager?

11   A.  I'm a liaison between the law enforcement and the district

12   attorney's office, Erie County District Attorney's Office,

13   Office of Children and Youth and Crime Victim Center and the

14   Children Advocacy Center for all instance of child abuse in

15   the county.

16   Q.  How long have you had that position?

17   A.  Approximately three years.

18   Q.  What was some of your background in training for that

19   position?

20   A.  I have a bachelor degree in administration of justice from

21   the University of Pittsburgh and a master's degree in the same

22   from Mercyhurst College.

23   Q.  Can you describe what your duties might be in the course

24   of your work?

25   A.  Sure.  I coordinate all forensic interviews of any child

Laura Guncheon - Direct by Ms. Sanner

1  who alleged some sort of physical or sexual abuse in the

2  county if that child is under the age of 18.

3          I provide coordination between all the agencies

4  that I discussed relative to that case and the investigative

5  process of that case.  Basically, I track all incidents from

6  its initial referral to our agency through sentencing in the

7  courthouse.

8  Q.  Did I ask you to review a claim that was made by Jennifer

9  Holland's younger son in this matter?

10 A.  Yes, you did.

11 Q.  And did you have an opportunity to review your agency's

12 records in that matter?

13 A.  I did.

14 Q.  Did OCY refer this matter to your office?

15 A.  That is correct.

16 Q.  Can you tell us how that came about?

17 A.  Sure.  On November 7 of 2003, we received a report of

18 suspected child abuse from the Office of Children and Youth,

19 and that comes to us in a form, which is called a CY1 form.

20 That form was mailed to us on that day which then started our

21 process in respect to that case.

22 Q.  And what happened after that was filed?

23 A.  That child was then scheduled for a forensic interview.

24 He came to us on November 25th of 2003, where he was

25 interviewed at our organization by Lieutenant Maggie Cooper,

Laura Guncheon - Direct by Ms. Sanner

1  Erie Police Department.

2  Q.  Did the child make statements during the interview?

3  A.  Yes, he did.

4  Q.  What did he state?

5  A.  During the November 25th interview, he disclosed that his

6  mom and dad had touched him in his pee-pee, and he pointed to

7  his penis while he said that.

8  Q.  Did he say anything in addition to that?

9  A.  That was basically it.

10 Q.  Was he interviewed on a number of different occasions?

11 A.  Yes, he was.

12 Q.  Was his testimony the same, different?

13 A.  It was basically the same.  He was then additionally

14 interviewed on December 9 of 2003 where he, again, disclosed

15 that his real mom and dad had touched his pee-pee, and he

16 further disclosed that his mom would squeeze it, and it would

17 hurt, and she would call him a bad name, and he said that bad

18 name was asshole.

19 Q.  Did the child ever say that a foster parent or anybody

20 else abused him?

21 A.  No, he did not.

22 Q.  His allegations were towards his mother abusing him?

23 A.  And his biological father.

24 Q.  What happened with those allegations?

25 A.  The case was then further processed by the Erie Police

Laura Guncheon - Direct by Ms. Sanner

1   Department.  Lieutenant Maggie Cooper did interview both

2   Mr. and Mrs. Holland.

3            She then submitted her final report for review.  It

4   was reviewed by Assistant District Attorney David Hopkins who

5   then approved charges be filed on December 18 of 2003.

6   Q.  And charges were filed, and the defendant was arrested?

7   A.  Subsequently after that, yes.

8   Q.  Was this claim eventually dismissed?

9   A.  Charges were dropped at the preliminary hearing on April

10  2nd, 2004.

11  Q.  Can you tell us how that came about?

12  A.  I was not present at the hearing.  I do have in my file in

13  my notes charges were dropped.  The victim was not able to

14  testify at that point.

15  Q.  Why was the 3-year-old victim not able to testify?

16           MR. PATTON:  Objection.  She was not at the

17  hearing.  She has no basis of knowledge for that.

18  Q.  Was the child ever found to be incredible or untruthful?

19  A.  Not untruthful, but he was never able to be certified by

20  the Court to be credible as a witness.

21  Q.  Was he too young?

22  A.  Yes.

23  Q.  He was simply too young to testify?

24  A.  Correct.

25           MS. SANNER:  Nothing further.

Laura Guncheon - Cross by Mr. Patton

1                          CROSS-EXAMINATION

2    BY MR. PATTON:

3    Q.   Ms. Guncheon, do you have your agency file with you?

4    A.   I do.

5              MR. PATTON:   Your Honor, I ask that I be able to

6    review that file on what she is basing her testimony on.

7              THE COURT:   Quickly.

8              (Pause in the proceedings.)

9    Q.   Ma'am, were you present at any of the interviews of the

10   child?

11   A.   I was both -- not in the observation room, no.

12   Q.   So you didn't see any of the statements the child made?

13   A.   Typically, I'm not present during the interviews, no.

14   Q.   And you're aware, are you not, that OCY came to the

15   conclusion that the allegations of abuse were unfounded,

16   correct?

17   A.   I was not aware of that.

18   Q.   You didn't know that?

19   A.   No.  We do try to determine what their determination is to

20   have that in our records, but I was unaware -- I was unable to

21   update that information from them.

22   Q.   You were unable to obtain the information?

23   A.   Yes.  I did inquire as to the status of their case, but

24   the person that I spoke to was unable to provide that

25   information to me today.

Laura Guncheon - Redirect by Ms. Sanner

1  Q.  Today you inquired about it, today?

2  A.  Correct, because we are in the process of updating our

3  records.

4  Q.  So you weren't -- you didn't look into OCY's finding until

5  today, is that accurate?

6  A.  That's correct, but that is not something that is out of

7  the ordinary, sir.

8         MR. PATTON:  Those are my questions, Your Honor.

9                  REDIRECT EXAMINATION

10  BY MS. SANNER:

11  Q.  One brief question.  There is a difference between the

12  OCY's determination and your office's determination?

13  A.  That is correct.

14  Q.  Can you explain to the Court what that would be?

15  A.  Sure.  They are bound by a different law than we are. They

16  are bound by the Child Protective Services law, and we are

17  bound by the child criminal law.

18  Q.  Would there be a situation where the case could not be

19  prosecuted even though the allegations were true?

20  A.  Yes.

21  Q.  Are there cases sometimes where you would have liked to

22  have proceeded with the prosecution but for some reason OCY

23  found it unfounded?

24  A.  Yes.

25         MS. SANNER:  Nothing further.

1          MR. PATTON:  Nothing further.

2          THE COURT:  Thank you.  Anything further,

3    Mr. Patton?

4          MR. PATTON:  No.

5          THE COURT:  Ms. Sanner?

6          MS. SANNER:  Nothing, Your Honor.

7          THE COURT:  Okay.  Is there anything you would like

8    to say in behalf of your client or any testimony you want to

9    elicit in addition to what we heard?

10         MR. PATTON:  Your Honor, I would like to make

11   argument, and Ms. Holland does wish to make a statement to

12   Your Honor.

13         It is undisputable or indisputable, I should say,

14   and is not disputed that the offense of possessing child

15   pornography is a serious offense.  It is an offense that is

16   difficult for society to deal with because it is an offense

17   that harms the most vulnerable people, but the question you

18   have to decide is what's the appropriate sentence for Jennifer

19   Holland.

20         Based on all the facts and circumstances of her

21   life and her case.  While we have made an argument both for

22   downward departure under the guidelines, we are also making an

23   argument for a sentence of probation with home confinement

24   based on the factors listed in 18 USC Code, Section 3553(a),

25   whether you would choose to do it through a downward departure

1    or through the discretion you have under Booker, that is the

2    sentence we are asking for; and I do not ask for it lightly

3    because I understand that the guidelines call for a range of

4    27 to 33 months.

5         But in examining this case and the way it has

6    proceeded, I would submit that the factors that are in 3553(a)

7    support the sentence we are asking for.

8         As far as protecting the public in the future from

9    Jennifer, it's now been roughly six and a half, seven years

10   since the offense was committed, and there is no evidence that

11   Jennifer is a danger to society or anyone else.

12        Now, the issue with the computer in the home when

13   Jennifer was arrested, a couple things on that.  No. 1,

14   Mr. Holland testified under oath at the detention hearing, and

15   I have the transcript of it, that any pornographic material

16   that was on the computer was there as a result of his use of

17   the computer, and Mr. Pettis testified to the same thing

18   today, that Darren had told him the same thing.

19        Also, that Jennifer didn't use the computer, that

20   Mr. Holland used it and Sean would sometimes use it for

21   school, but they also had filtering equipment on it.

22        I find it remarkable, absolutely remarkable that

23   after a passage of just about two years, it will be two years

24   here next week, that if that computer really had child

25   pornography on it, that no charges have been filed and, in

1    fact, going back to look at some of the other files I have of

2    other clients I have been appointed to represent on charges of

3    possession of child pornography to check on the length of time

4    between when the computer was seized and when charges were

5    filed, and in the one case we were appointed to where ICE was

6    the investigating agent, the person was charged the next day,

7    the day after the computer was seized.

8         In our case with the FBI, there was a six-month

9    delay between seizure of the computer and charges being filed.

10    Another case, less than three months.  In another case, about

11    six months.  A current case that I have that was conducted by

12    the FBI, the computer was seized on October 8th, and charges

13    were filed on April 27th.  Again, not quite six months.

14         In none of these other cases, and I'm not saying

15    this represents the entire universe obviously of child

16    pornography cases, but it has never, ever taken two years to

17    decide to look at the hard drive and make a decision whether

18    or not there's child pornography on it.

19         Mr. Holland testified under oath if there's

20    anything on there, he put it there.  He testified to that at

21    the detention hearing and did so at least based on his

22    testimony because he says look, I'm absolutely confident, and

23    I know what is on there, I'm absolutely confident there isn't

24    anything on there that is child pornography.

25         The Government can say well, there's an

1    investigation pending.  Well, an investigation pending cannot

2    be used to infer guilt.

3           There hasn't been a finding of probable cause in

4    the case.  Judge Barber signed the search warrant authorizing

5    the seizure of the computer, but the Grand Jury hasn't found

6    there was even probable cause to believe there is anything on

7    the computer.

8           A criminal complaint hasn't been filed, and I would

9    submit if there was child pornography on that computer,

10   Mr. Holland would have been charged long ago during a

11   timeframe where the state apparatus was trying to keep the

12   child out of the house and a timeframe.  If there was actually

13   child pornography, the Government could have used it in this

14   case to show that it really existed.

15          As far as the allegations with the youngest child,

16   Your Honor, Mr. Pettis testified that he and the in-take

17   worker talked with Zachary three times, the youngest child,

18   three times regarding these allegations in an attempt to get a

19   coherent and consistent idea of what happened; and based on

20   their interviews, the Office of Children and Youth made a

21   finding that the charges were unfounded.

22          Mr. Pettis said he made allegations about a lot of

23   people, and they weren't consistent and they were not -- they

24   found it unfounded.

25          Ms. Holland was arrested and charged.  Those

1    charges were dismissed.   The Government wants to turn a

2    presumption of innocence into a presumption of guilt.

3            Your Honor knows that there is literature that

4    suggests that children are susceptible to suggestion.   The

5    youngest child didn't make any allegations against his parents

6    in the first foster home, didn't make any allegations of his

7    parents in the third foster home.   It was just in the one

8    foster home there were problems, and for confidentiality

9    reasons and other reasons, Mr. Pettis said that he won't

10   utilize that home anymore.

11           In this proceeding for you to make the assumption

12   that Ms. Holland did, in fact, abuse her child or even think

13   in any way that she did is a complete disservice to what our

14   legal system is supposed to be about.

15           Mr. Horner testified and explained based on his

16   experience in interacting with the children and with the

17   parents, there's a bond that these people have.   Mr. Pettis

18   said the same thing.

19           You have Mr. Horner very candidly saying to you he

20   feels, given what these children already have gone through, it

21   would be devastating if Jennifer is taken out of the house.

22           The fact that one agency found that the allegations

23   may be true and may have warranted findings, well, there's

24   another agency that did the exact same investigation or talked

25   with the same child and came to the exact opposite conclusion.

1          So while the Government's paper, it's their

2    response to our position with respect to sentencing factors

3    makes the statement that while the charges based on the

4    allegations of abuse to the younger child were ultimately

5    dismissed, they say that nothing, however, suggests they were

6    unfounded.  That's not accurate.  OCY's investigation itself

7    shows they were unfounded, or at least OCY came to the

8    conclusion they were unfounded.

9          There is no evidence that Jennifer fled Hawaii to

10   try and avoid prosecution.  There's been no evidence presented

11   to you in this case, in this hearing to try and support that.

12         The Superior Court opinion is attached to our

13   position.  The Superior Court based on the record they tried

14   to establish in the Commonwealth Court said that the report

15   did not support a finding that Jennifer left Hawaii to avoid

16   prosecution.  The evidence was she moved for a job transfer,

17   and as the presentence report shows, at the time Jennifer

18   moved from Hawaii here to Erie, she was working for Verizon.

19         It was really the only time in her life she was

20   making a substantial amount of money.  This is not

21   unsubstantiated.  It is substantiated through the Social

22   Security Administration, Paragraph 58 of the presentence

23   report that documents that Jennifer was working for Verizon

24   Directory Sales Corporation from 2000 to 2001, and she earned

25   $77,313.70.  That's the job she had when she got transferred

1    to Erie and came here so she could continue to make that

2    money.

3         She was living in Erie under her own name.  Her

4    name was in the phonebook.  That is in the detention hearing

5    transcript.  To find her, the agents went to the post office

6    and got her address from the post office under her real name

7    living at that address.

8         There is absolutely no evidence, none, that

9    Jennifer leaving Hawaii was done to try and avoid these

10   charges, and any intention that the Government tries to make

11   on that is simply not supported by any evidence.  That is, in

12   fact, contradicted by the actual evidence that you have.

13        Your Honor, I would submit to you that the only

14   thing gained by sending Jennifer to prison is some sense of

15   being able to stand up and say, well, we're tough on child

16   pornography, at the expense of the Holland family unit, that

17   the whole family had worked so hard to get back together.  As

18   Mr. Horner said the older boy saying I just want to be a

19   family, have some sense of normalcy.  I'm like everybody else.

20   I want a family that can be together.

21        Probation with home confinement is not a slap on

22   the wrist.  Home confinement is a serious penalty.  It's

23   difficult, and if she is on probation, if she would commit any

24   criminal acts or violate the terms of her probation, she can

25   be revoked, and you can sentence her back up to the statutory

1    maximum.

2              Allowing her to stay on probation allows her to

3    stay on her medications and receive the treatment she has been

4    given.  If you incarcerate her, she is not going to get that

5    medication.  She isn't going to get that type of psychological

6    treatment in the Bureau of Prisons.

7              The Bureau of Prisons wouldn't even let her bring

8    medication in.  She'll have to stop her medication and go

9    through the process of having the Bureau of Prisons people do

10   an evaluation of her, and she's gotten to a place where she's

11   doing well.

12             So I would ask you to consider the letters that

13   were sent, Mr. Horner's letter, his testimony, the testimony

14   of the foster parents who said Ms. Holland and her husband's

15   dedication to the children is something foster parents rarely

16   see.

17             Taking her out of the home and putting her in

18   prison will not deter anybody from committing this crime any

19   more than sending her to jail for 27 months will and will just

20   devastate the family.

21             Ms. Holland would like to make a statement.

22             THE COURT:  Ms. Holland.

23             THE DEFENDANT:  When I was younger, I dreamed of

24   being Cinderella, of having the perfect life.

25             When I grew up, I became a monster.  I did the same

horrible acts that were done to me as a child.  When my son

was taken in Hawaii, I realized the severity of my mental

illness.

Before then I went to doctors but just didn't

understand, didn't think that I could do that act.  I accept

full responsibility of what I've done, and I know the

punishment is due.

There's not a night that I don't sit for 15, 20

minutes or longer and think of those children and their faces.

I hope to God they are safe now and I pray, pray for some type

of forgiveness from them.

I apologize to the Court, to my family for hurting

them and putting them through this, and most of all, to those

children that didn't deserve anything.

Since then I have gone through numerous sexual

counseling, numerous therapies.  I continue today with therapy

to make sure that nothing like this could ever happen.  I am

on mood stabilizers, which I take faithfully.  I'm on

medicine, which I take faithfully.  I will do everything,

everything in my effort to make sure that nothing will ever

happen like that did.

I love my family.  I love my children.  I know what

I have done is wrong, and I can't take it back; but it will

never happen again, ever, and I will never have a computer in

my house ever again.

1          I struggle with my self-image right now, and I

2     struggle with the guilt every day.  I don't forget what I have

3     done, and I never will.  To me if I forget, it's just like

4     yesterday.  It happens again, and I will never let anything

5     like this happen again.  That's all I have to say.

6          THE COURT:  Thank you.  Ms. Sanner.

7          MS. SANNER:  There is some things in this case that

8     aren't in dispute.  The younger child's allegations that his

9     mom sexually molested him in December of 2003 is something

10    that the parties dispute.

11         There is a dispute as to what the truthfulness of

12    those charges could have been, but that isn't the case that is

13    before this Court.  What may happen with the current

14    investigation as to those images that were found on the

15    computer in her home when she was arrested, that's unknown.

16         The most important things in this case, however,

17    are not in dispute.  What is not in dispute is that this is a

18    serious offense.  The defendant possessed a number of pictures

19    of prepubescent children engaging in sexually explicit

20    conduct.  These images showed children being penetrated by

21    adult males, children performing oral copulation on adults.

22    One child is depicted engaging in sadistic and masochistic

23    conduct.  This little girl is shown bound, gagged, and she

24    hangs from chains from the ceiling.

25         That these children were hurt, there is and can be

1    no dispute.   These kids were hurt, and they were hurt badly,

2    and the defendant can't dispute that.   The incarceration of

3    this defendant is just punishment.   It would protect children

4    who are similarly abused and degraded, innocent victims of

5    child pornography and would deter others from that conduct.

6         The Court was asked today to depart downwards for

7    extraordinary conduct.   There's nothing extraordinary about

8    this case except for the sadness of it.

9         This Court is no longer bound by the sentencing

10   guidelines.   The range from the 1997 guidelines would have

11   been 27 to 33 months.   What's unfortunate is that those

12   guidelines don't take into account the fact that the images

13   that she possessed depicted sadistic, masochistic conduct done

14   to children.

15        The Government didn't request an upward departure

16   for this defendant, but that is something that this Court

17   should consider in determining what the appropriate sentence

18   for this defendant is.   If that guideline had applied, she

19   would have received a four level upward departure.   That would

20   place her in the range of about 50 months imprisonment, not 27

21   to 33.

22        Under the sentencing guidelines, or under the 3rd

23   Circuit law, when you look at whether a downward departure is

24   authorized for extraordinary family circumstances, the Court,

25   conducting a fact-intensive inquiry, sweepingly held that the

District Court can't grant a downward departure motion based

on generic concerns for breaking up a family.  Departures for

family responsibilities are discouraged, and they should only

occur in exceptional circumstances.  Even the incarceration of

a single parent is not atypical, and here the defendant is

married.

Innumerable defendants can show their incarceration

will be hard on their children, but sweepingly, the 3rd

Circuit, expressly rejected the argument a departure is

warranted even where a parent has a good influence on their

child's life.

Nothing in this record shows the defendant is in

any way irreplaceable to her family.  Even if she earned

$77,000 when she first came here, she certainly didn't

continue supporting them in that way.  At bottom, the harm

that this woman's children may suffer from her incarceration

is no different than any defendant experiences.

The fact that she is a woman and the fact that she

is a mother does not mitigate the harm that she did to these

children that were injured in those pictures or to her own if

those charges that the youngster made and the older child did

make were found to be true.

Based on the interest in deterrence and

incapacitation and just punishment, the Government urges the

Court to sentence the defendant to 33 months imprisonment.

1          THE COURT:  Thank you.

2          Well, as everybody agrees, this is a difficult

3    case.  Is there any reason sentence should not be imposed at

4    this time, Mr. Patton?

5          MR. PATTON:  No.

6          THE COURT:  Ms. Holland?

7          THE DEFENDANT:  No.

8          THE COURT:  As I started to say, everybody agrees

9    it's a difficult case.  I think, perhaps, it felt like a child

10   welfare hearing more than a criminal court hearing, which I

11   presided over for 11 years in the Juvenile Court of Allegheny

12   County; but in any event, I think we do lose track of the

13   reason we're here.

14         The indictment didn't accuse Ms. Holland of abusing

15   her children.  The indictment accused her of possessing child

16   pornography, and in that case, the children, who are in those

17   pictures and depictions, are the ones who are suffering.

18   That's why Congress is so tough on child pornography because

19   if we permit the sale of it, there's money involved, and there

20   is going to be more of it.  If it stops, then the children are

21   not going to suffer as a result.

22         For that reason, I'm going to deny the motion for

23   downward departure and impose the following sentence:

24         It's the judgment of the Court that the defendant,

25   Jennifer Holland, is hereby committed to the custody of the

1    Bureau of Prisons to be imprisoned for a term of 30 months.

2              Upon release from imprisonment, the defendant shall

3    be placed on supervised release for a term of three years.

4    Within 72 hours of release from the custody of the Bureau of

5    Prisons, the defendant shall report in person to the probation

6    office in the district to which she's released.  While on

7    supervised release, the defendant shall not commit another

8    federal, state, or local crime.

9              She'll comply with the standard conditions that

10   have been recommended by the Sentencing Commission and adopted

11   by this Court and shall also comply with the following

12   additional conditions:

13             The defendant shall not illegally possess a

14   controlled substance.

15             The defendant shall not posses a firearm or other

16   destructive device.

17             The defendant shall participate in a program of

18   testing, and if necessary, treatment for substance abuse as

19   directed by the probation officer until such time as the

20   defendant is released from the program by the probation

21   officer.

22             Further, the defendant shall be required to

23   contribute to the cost of services for any such treatment in

24   an amount determined by the probation officer, but not to

25   exceed the actual cost.

1         The defendant shall submit to one drug urinalysis

2 within 15 days after being placed on supervised release and at

3 least two periodic tests thereafter.

4         The defendant shall participate in a mental health

5 treatment program and/or sex offender treatment program as

6 approved and directed by the probation officer.

7         The defendant shall abide by all program rules,

8 requirements, and conditions of the sex offender treatment

9 program, including submission to polygraph testing to

10 determine if she is in compliance with the conditions of

11 release and in accordance with 18 United States Code, Section

12 3583(d) and Section 4042(c)(4).

13         The defendant shall report the address where she

14 will reside and any subsequent change of address to the

15 probation officer responsible for the defendant's supervision;

16 and further, the Defendant shall register as a convicted sex

17 offender in any state where she resides, is employed, carries

18 on a vocational, or is a student.

19         The defendant shall not have any unsupervised

20 conduct with any person under the age of 18 except in the

21 presence of a responsible adult who is aware of the nature of

22 the defendant 's background and current events and has been

23 approved in advance by the probation officer.

24         The defendant shall not possess any materials

25 including pictures, photographs, books, writings, drawings,

1   videos, or video games depicting and/or describing child

2   pornography as defined at 18 United States Code, Section

3   2256(8).

4           The defendant shall use only those computers and

5   computer-related devices, user names, passwords, email

6   accounts, and Internet service providers as approved by the

7   probation officer.

8           Computers and computer-related devices include, but

9   are not limited to, personal computers, personal data

10  assistants, Internet appliances, electronic games, and

11  cellular telephones, as well as private equipment that can

12  access or modified access the Internet, electronic bulletin

13  boards, other computers, or similar media.

14          The defendant shall cooperate in the collection of

15  DNA as directed by the probation office.

16          It is further ordered the defendant shall pay to

17  the United States a special assessment of $100, which shall be

18  paid to the U.S. District Court Clerk forthwith.

19          The Court finds that the defendant does not have

20  the ability to pay a fine, and the Court then waives the fine

21  in this case.

22          The sentence is within the guideline range.  The

23  range does not exceed 24 months, and the sentence is imposed

24  for the reasons previously stated here.

25          We believe that a term of 30 months imprisonment,

1    followed by a period of three years of supervised release will

2    adequately address the sentencing objectives of individual and

3    general deterrence and punishment, as well as the protection

4    of the community.

5         Ms. Holland, you have a right to appeal on -- I'm

6    not sure if there were conditions with respect to -- was there

7    a letter?  Was there a plea letter?

8         MS. SANNER:  I don't know that there was a plea

9    agreement in this case.

10        THE COURT:  I don't think there was.  You have a

11   right to appeal.  Any notice of appeal must be filed within

12   ten days.  You are entitled to a lawyer at every stage of the

13   proceedings.  If you cannot afford an attorney, one will be

14   provided for you without charge.

15        Now, as long as I have your word, Ms. Holland, you

16   will report as directed to whatever institution the Bureau of

17   Prisons says you are to be assigned.

18        I will permit you to be released at this time on

19   the same terms and conditions as you have been operating under

20   until now.

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  Do I have your word?

23        THE DEFENDANT:  Yes, you do.

24        MR. PATTON:  Two wishes.  The one condition you

25   have Ms. Holland not have any contact with anyone under the

1    age of 18.   Obviously, her youngest son is under 18.

2             THE COURT:  We'll waive that condition as far as

3    her son is concerned.

4             MR. PATTON:  We would also object to the condition

5    ordering her to submit to DNA.

6             THE COURT:  We'll deny that.

7             MR. PATTON:  As an unconstitutional search.

8             THE COURT:  We'll deny that.  Court is adjourned.

9          (Whereupon, the above sentencing hearing was concluded.)

10                             - - -

11

12     I hereby certify by my original signature herein that the

13    foregoing is a correct transcript from the record of proceedings

14    in the above-entitled matter.

15

16

17              S/ Karen M. Earley

18                  Karen M. Earley, RDR-CRR

19                  Official Court Reporter

20

21

22        *** NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE ***

23

24

25